Albert PARNES, Plaintiff,

v.

HEINOLD COMMODITIES, INC., Defendant.

No. 79 C 4047.

United States District Court, N. D. Illinois, E. D.

April 20, 1982.

See also, D.C., 487 F.Supp. 645.

Herbert Beigel, Ira J. Bornstein, Barnett & Beigel, Chicago, Ill., for plaintiff.

William F. Conlon, Paul F. McCarthy, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Albert Parnes ("Parnes") and his sister Rosalyn Christensen ("Christensen") sued Heinold Commodities, Inc. ("Heinold") in five counts, all arising out of an alleged scheme by Heinold (through two of its agents) to defraud plaintiffs. Before trial Heinold moved for judgment on the pleadings as to Count V of the Second Amended Complaint ("Complaint"), grounded on the Racketeer Influenced and Corrupt Organization Act ("RICO" [1]), 18 U.S.C. §§ 1961–68 (all citations to Title 18 in this opinion will read simply "Section—"). For the reasons summarized in this Court's pre-trial oral ruling and now expanded in this memorandum opinion and order, Heinold's motion was granted and Count V was dismissed.

### Facts [2]

Heinold is a major commodities brokerage firm.[3] In March 1978 two Heinold-employed brokers, Pat Keever ("Keever") and Larry Costello ("Costello"), solicited Parnes to open a commodities trading account with Heinold. Parnes did so. In June 1978, at the advice and insistence of Keever and Costello that investing more money would bring greater profits, Parnes opened another account with his own funds, this one in Christensen's name. Because Christensen had given Parnes authority to trade her account, Keever and Costello limited their direct contact to Parnes.

Throughout the trading period Keever and Costello made numerous fraudulent misstatements to Parnes. Those misrepresentations included statements that:

(1) Trading for the accounts was part of a prudent commodities investment policy suitable for plaintiffs' investment objectives.

(2) Heinold's trading methods were consistent with plaintiffs' prudent investment goals and were in plaintiffs' best interest.

---

1. Given the statute's very awkward title and the convenient acronym it generated, this Court has always suspected the person who christened the legislation was a movie buff with a sense of humor. In "Little Caesar," the first Hollywood gangster movie of the early 30s (a prototype that spawned an entire genre), Edward G. Robinson played the thinly-disguised Al Capone leading role—and was named "Rico."

2. Because Heinold's motion was for judgment on the pleadings under Fed.R.Civ.P. ("Rule") 12(c), the allegations of Complaint Count V have been taken as true, coupled with any facts of which the Court may take judicial notice.

Wright & Miller, 5 Fed. Practice & Procedure § 1367 at 685 (1969 ed.). In this case the inquiry is much like that under Rule 12(b)(6). *Id.* § 1369, at 701–02. This section of the opinion deals with the Complaint's allegations common to all five counts, while the "RICO" section states the allegations unique to Count V.

3. There is no dispute that Heinold has over 100 branch offices and is a member of all domestic commodities exchanges. Neither of the persons who dealt with Parnes was a high-level official of Heinold: Costello was manager of Heinold's small Northfield, Illinois office, and Keever was a broker under Costello's supervision.

(3) Keever and Costello had great expertise in commodities trading.

(4) Keever and Costello would watch closely over plaintiffs' accounts. Because of such supervision plaintiffs suffered little or no risk of loss.

(5) No unauthorized trading would take place in either account. Parnes would be consulted before each transaction.

In September 1978 Parnes learned from Costello that Keever had misrepresented to Parnes the extent of the losses in plaintiffs' accounts as well as the current positions held in both accounts. Costello promised to stop the prior course of conduct and sent Parnes a letter to that effect.

Despite Costello's promise Heinold (through Costello) continued to engage in unauthorized and otherwise fraudulent trading in the Christensen account. That was done with knowledge that such use of the Christensen account would conceal the unauthorized trading from Parnes (confirmations of the trades were sent to Christensen because the account was in her name).

As a result of the activities described in this section of this opinion, plaintiffs suffered over $35,000 in losses.

### RICO

■ It is no secret what target Congress had in mind when it enacted RICO: It principally wanted to halt what it understood to be a pattern of infiltration of business by organized crime.[4] As *United States v. Turkette*, 452 U.S. 576, 591, 101 S.Ct. 2524, 2533, 69 L.Ed.2d 246 (1981) put it:

[T]he primary purpose of RICO is to cope with the infiltration of legitimate businesses. . . .

But drafting a statute (as distinct from *titling* a statute) in those terms posed quite another problem. "Organized crime" had an air redolent of the famed Justice Stewart effort to grapple with another troublesome definition in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring):

I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [of hard-core pornography]; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that.

Definition was obviously elusive. And to employ the undefined term "organized crime" in substantive prohibitions would invite attacks on the legislation as "void for vagueness" or otherwise, as well as creating problems of proof.[5]

So the legislative draftsmen took another approach. They defined "racketeering activity" in Section 1961(1)(B) to embrace any act indictable under a host of federal statutes (most notably for current purposes the mail fraud provision, Section 1341). Then, using a device familiar to Illinois practitioners,[6] Congress defined a *"pattern* of racketeering activity" as requiring, Section 1961(5):

at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity. . . .

Next Section 1962(c) provided:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of

---

4. RICO was Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, whose stated purpose was "to seek the eradication of organized crime in the United States . . . by establishing new penal provisions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."

5. See the discussion by our Court of Appeals in *United States v. Aleman*, 609 F.2d 298, 302–06

(7th Cir. 1979), dealing with like onslaughts against RICO even as enacted.

6. When "dissolution of marriage" was still known as "divorce" and the available causes for divorce were narrow, the ground of "extreme and repeated cruelty," Ill.Rev.Stat. ch. 40, § 1 (1975), became converted by an amiable fiction into testimony (usually perjured by mutual agreement) that "He struck me on two occasions."

which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

And finally Section 1964(c) created a private cause of action against violators of Section 1962, including a provision for treble damages.

Clearly the difficulties of drafting had caused RICO to sweep up far more than its originally intended compass. Litigators, never at a loss for ingenuity, naturally found the prospect of treble damages under Section 1964(c) (as well as the possibility of invoking what might otherwise be unavailable federal jurisdiction) very inviting for garden-variety fraud claims. After all the broad scope already given the mail fraud statute in such cases as *United States v. George*, 477 F.2d 508, 511 (7th Cir. 1973) required only:

(1) a scheme to defraud and

(2) use of the mails in furtherance of that scheme.

Two mailings hardly posed much of a problem to find in even the most pedestrian alleged fraud.

And so the federal courts have had to wrestle with a host of problems unanticipated by Congress in its primary effort to curb the expansion of "organized crime" into "legitimate business." *Turkette*, which held criminal infiltration of *criminal* businesses covered as well, was illustrative of only one such problem. But on the civil side the judicial responses have often reflected an uneasiness with RICO's possible swallowing up of all common law fraud, a clearly unintended result reached in a clearly unintended way. That has led to such narrowing opinions as (to take only this District Court as an example) *Salisbury v. Chapman*, 527 F.Supp. 577, 579–80 (N.D.Ill. 1981); *North Barrington Development, Inc.*

*v. Fanslow*, No. 80 C 2644, slip op. at 6–8 (N.D.Ill. Oct. 9, 1980); [7] *Katzen v. Continental Illinois Nat'l Bank & Trust Co.*, No. 80 C 1378, slip op. at 9–10 (N.D.Ill. Aug. 14, 1980).

Count V epitomizes efforts by litigants to expand RICO beyond its intended boundaries. It asserts that in furtherance of the scheme to defraud plaintiffs, Heinold "used or caused to be used" mail delivered by the United States Postal Service two or more times. It thus states a prima facie case of mail fraud within Section 1341 and hence of a "pattern of racketeering activity" under Sections 1961(1)(B) and 1961(5).

But where plaintiffs must founder is in their effort to make the quantum leap from those prima facie conclusions to Section 1964 coverage. They have tried to reshape a conventional (alleged) fraud, perpetrated by lower-level corporate executives acting without corporate sanction (albeit conducting themselves within the scope of their authority for common-law purposes), into a Section 1962(c) RICO violation by the *corporation*.

■ It must be remembered that Section 1962(c) requires:

(1) two parties, a "person" employed by or associated with an "enterprise"; and

(2) participation by the "person" in the conduct of the "enterprise" via a "pattern of racketeering activity."

Section 1964(c) in turn gives a civil remedy to a person injured in business or property by a violation of Section 1962.

■ By elementary principles of statutory construction, the Section 1964(c) cause of action—a suit for "violation" of Section 1962—must be asserted against the *violator* under the latter section. That violator is the "person" that has engaged in the "unlawful" conduct. It would be an obvious distortion to permit suit against the "enterprise" that had itself been infiltrated by the

---

7. *North Barrington Development* rejected a remedy under RICO for plaintiffs who could not show competitive injury from a RICO violation. That opinion has been cast in doubt by the recent dictum of our Court of Appeals in

*Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir. 1982). It is unnecessary to adopt either side of that question to decide this case.

"unlawful" conduct or participation of the "person"—the "enterprise" that may itself be a victim of the racketeering activity.[8]

Under the allegations of the Complaint the normal reading of the RICO sections would characterize brokers Keever and Costello, the two active wrongdoers, as the "persons" engaged in the conduct of Heinold's affairs through the brokers' "pattern of racketeering activity." Heinold would normally be viewed as the "enterprise" by whom the "persons" were employed. That normal reading however gives plaintiffs no comfort, for they have sued not the alleged RICO violators—"persons" Keever and Costello—but "enterprise" Heinold. Plaintiffs have not brought themselves within RICO's coverage under the normal application of the statutory definitions and terms.

There is though another alternative. RICO defines both "person" (Section 1961(3)) and "enterprise" (Section 1961(4)) so broadly as to embrace every kind of legal entity. That being the case we may look at the possibility of a strained reverse construction, under which *Heinold* would be the "person" (so as to be suable under Section 1964) and *Keever* and *Costello* would be the "enterprise." That possibility would turn the English language on its head. Heinold after all cannot be said to have "participated . . . in the conduct of [Keev-

er's and Costello's] affairs . . ." as required by Section 1962(c).[9] There is no hint of that (improbable as it is) in Count V. It must be concluded that plaintiffs cannot successfully invoke RICO under that theory either.

Analysis thus confirms the intuitive unease generated by a first reading of plaintiffs' essay into the arcane mysteries of RICO. At least where the RICO "enterprise" has been involved in a "pattern of racketeering activity" only through the acts of the "person" engaged in the conduct defined as "unlawful," the civil plaintiff can sue only the "person" and not the "enterprise" for damages suffered from that "racketeering activity." And that is fatal to plaintiffs' Count V claim.[10]

## Conclusion

As indicated at the outset of this opinion, the Court has already announced its dismissal of Count V shortly before the case went to trial. This opinion has expanded on the reasoning announced from the bench in so ruling.

---

**8.** *Cenco* uses the term "criminal enterprise" at slip op. 13–14, but its entire discussion makes plain that on the allegations in that case Cenco itself was the claimed infiltrator—the "person" in Section 1962(c) terms. Judge Posner's common parlance usage of the word "enterprise," rather than using the term only as defined in RICO, should not serve to cloud over the analysis in this opinion. Of course the *Cenco* opinion was not focusing on the current issue, so that the terminology it employed was not critical. *Cenco's* view of Section 1964 liability is not at odds with this opinion.

**9.** Even were that possible *Heinold* would also have to be considered as having engaged in the "pattern of racketeering activity" by virtue of having ascribed to it the mail fraud perpetrated by Keever and Costello. That sort of respondeat superior application, perhaps permissible to establish ordinary civil liability, would be bizarre indeed as a means to warp the facts alleged in this case into the RICO mold. Under

that theory malefactors at a low corporate level could thrust treble damage liability on a wholly unwitting corporate management and shareholders.

**10.** At the very earliest stages of this litigation Judge Bua, to whom the case was then assigned, decided the question of Count V's viability the other way in *Parnes v. Heinold Commodities*, 487 F.Supp. 645 (N.D.Ill.1980). But the question was not posed to Judge Bua in the manner discussed in the text of this opinion (indeed the text analysis owes nothing to the litigants themselves). Accordingly the Court does not regard law of the case or any other doctrine as requiring adherence to the earlier opinion. Though not critical to the result, this opinion's reading of RICO is wholly consistent with the decisions by other judges of this District Court referred to earlier in the text, as well as with the very recent Court of Appeals' discussion in *Cenco*.