R. Stockton RUSH, III, Plaintiff,

v.

OPPENHEIMER & CO., INC., and
Scott Seskis, Defendants.

No. 84 Civ. 3219 (RWS).

United States District Court,
S.D. New York.

Dec. 24, 1985.

Lovell & Stewart, New York City, for plaintiff; Christopher Lovell, Victor E. Stewart, of counsel.

Gold, Farrell & Marks, New York City, for defendants; Martin R. Gold, Hugh M. McGovern, of counsel.

SWEET, District Judge.

Plaintiff R. Stockton Rush III ("Rush") commenced this action against co-defendants Oppenheimer and Co., Inc. and Scott Seskis (collectively "defendants") seeking to recover for damages caused by the defendants' alleged violations of the federal securities laws, violations of New York State common law principles of fraud and breaches of fiduciary duty, and violations of Section 901(a) of the Organized Crime Control Act of 1970. On July 19, 1985, Rush moved pursuant to Rule 15(a) of the Fed.R.Civ.P. to reinstate his RICO cause of action which was dismissed by this court on August 23, 1984 for failure to state a claim upon which relief could be granted. *Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108 (S.D.N.Y.1984). For the reasons set forth below, the motion to reinstate the civil RICO claim is denied.

**Prior Proceedings**

On May 8, 1984, Rush filed this complaint claiming that the defendants (1) violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated under that section. 17 C.F.R. § 240.10b–5 (1983); (2) violated a fiduciary duty to Rush arising under the laws of New York; (3) engaged in an on-going "racketeering activity" prohibited by section 901(a) of the Organized Crime Control Act of 1970, entitled Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1961 *et seq.* (hereinafter "RICO").

On June 25, 1984, the defendants moved for an order dismissing the complaint pursuant to Rule 9(b) Fed.R.Civ.P. for failure to allege fraud with sufficient particularity, and pursuant to Rule 12(b)(6) Fed.R.Civ.P. for failure to state a claim upon which relief could be granted. At oral argument on this motion, Rush consented to file an amended complaint to satisfy the particularity requirements of Rule 9(b) and filed this amended complaint on August 23, 1984. By opinion of August 23, 1984, this court granted the defendants 12(b)(6) motion with respect to the punitive damages claimed under the cause of action for common law fraud, and with respect to the civil RICO claim. The claim based on the alleged 10b–5 violations withstood the challenge of the 12(b)(6) dismissal motion.

On August 31, 1984, Rush filed a motion for reargument on the portion of the August 23, 1984 opinion which dismissed his claim for punitive damages under common-law fraud principles. This motion to reinstate the punitive damages claim was granted on November 9, 1985, *Rush v. Oppenheimer & Co., Inc.*, 596 F.Supp. 1529 (S.D.N.Y.1984). The defendants' subsequent motion to sever the pendent common law claims and compel arbitration of those claims was denied. *Rush v. Oppenheimer & Co., Inc.*, 606 F.Supp. 300 (S.D.N.Y. 1985), however, such denial of the motion to sever the common law claims was reversed on appeal. *Rush v. Oppenheimer*, 779 F.2d 885 (2d Cir.1985).

**Facts**

The facts set out in this court's prior opinions must be reiterated here in order to evaluate whether Rush has properly pled his RICO claim. This action arises out of a two-year stock broker-customer relationship between Rush and the defendant Scott Seskis ("Seskis") who was employed by defendant Oppenheimer & Co., Inc. ("Oppenheimer"), as a registered representative. Rush alleges that Seskis, under the control and supervision of Oppenheimer, a Delaware corporation engaging in the business of securities brokerage, excessively traded the stocks in Rush's account ("churning"), and knowingly made unsuitable recommendations to Rush as to the purchases of stocks.

According to Rush, Seskis began to solicit Rush's business in November, 1981, and requested that Rush open an account with him at Oppenheimer. Rush alleges that he

made it clear to Seskis from the start that he was a novice at investing, and that he was a financially unsophisticated eighteen-year old with no prior dealings with investment houses and no prior experience with the "devices of Wall Street." Rush also claims that during the first two months of this business relationship, he informed Seskis that his primary concern was an inheritance of 20,000 fully-paid shares of Natomas Company common stock which was being held for him in trust, and which he could not sell for tax reasons.

Seskis allegedly made persistent efforts from November through December, 1981 to convince Rush to transfer his Natomas shares into his Oppenheimer account, where they could be used as collateral for purchases made on margin. Rush states that he refused such transfer requests, and claims that he clearly conveyed to Seskis his unwillingness to make investments on margin, a process which he did not understand and which he considered "dangerous." Despite these expressed wishes of his customer, Seskis allegedly made the following untrue statements in an attempt to convince Rush to transfer his Natomas stock to Oppenheimer and permit Seskis to use these shares as collateral for risky stock transactions:

(a) that defendants were among the few brokers in the country who had the skill to invest in and "write" call options on equity securities in a conservative, risk-free system;

(b) that defendant Seskis had developed and refined a system of writing call options which was guaranteed to produce income as regularly as "dividends on blue chip stock";

(c) that defendant Seskis had numerous large accounts trusting him to invest for them in securities and, particularly, options thereon pursuant to his system;

(d) that defendant Seskis was financially well-off, recommended profitable options and other investments on a consistent basis, and that "see, every day that goes by that you don't get your Natomas stock in here, you lose money

we would have made for you writing options on it";

(e) that defendants had "excellent" skill, operations and integrity on which plaintiff could rely and in which he could place his trust and confidence, for investment advice in the nature of a fiduciary relationship as existed over his trust account; and

(f) that defendants intended to avoid the "margin" investments which plaintiff had stated he wanted to avoid, and intended to undertake a prudent Natomas options writing program against his Natomas stock, and that he should, therefore, transfer the Natomas shares out of his trust account where he would make more money.

Rush's amended complaint also enumerates the omissions of material facts necessary to make Seskis' representations misleading (¶ 16a–g). According to Rush, he entrusted his Natomas shares to the defendants on or about March 31, 1982 in reliance on these misrepresentations, with the understanding that Seskis would undertake only a strictly limited program of writing Natomas options against the Natomas stock. Rush asserts that in the 18 months following the transfer of control over the Natomas shares to defendants, the defendants purchases unauthorized, unsuitable securities for Rush's account; charged Rush $92,000 in brokerage commissions and $47,-000 in margin interest on an average equity balance of $275,000; caused him in excess of $300,000 in "investment" losses; made 325 separate transactions in his account; transformed such account into defendant Seskis' largest single and principal source of income; and "turned over" the $275,000 average account balance in excess of ten times. Throughout this period, and without Rush's permission, defendants allegedly traded in unauthorized stocks and financed these purchases with "margin" loans on Rush's account secured by Rush's Natomas stock. Rush alleges that defendants would only obtain his consent to these transactions subsequent to the transaction itself, and that such consent was obtained obliquely at best and by further untruthful

assertions regarding the nature of the stocks purchased and the justification for such purchases.

Rush further alleges that in June, 1982, he informed Seskis that he would be out of touch for the summer and instructed him to limit activity in the account to the liquidation of existing non-Natomas positions or the writing of options against his Natomas stock. According to Rush, however, defendants escalated the prohibited activities in the period between June 14 and August 11, initiating numerous purchases and sales of securities financed by margin loans on Rush's account. When Rush returned in August, he discovered and vigorously protested these continued violations of his understanding with Seskis. Rush claims that Seskis, in order to maintain Rush's acquiescence in transactions violative of the pre-summer agreement and in order to maintain Rush as a client, began to deceive Rush about both the nature of the securities defendants were purchasing and the underlying profitability of Rush's account, knowingly transforming large losses into apparent profits. Relying upon these false reports, Rush consented to defendants' continued control over his account until September, 1983, during which time Seskis purchased unauthorized stocks and highly risky options through margin financing. Finally, in September, 1983, upon being informed of the nature of the defendants' transactions over the prior period, Rush allegedly demanded a written profit and loss accounting. Rush maintains that defendants refused to produce such a document, falsely claiming several times to have sent him such an accounting.

Rush's final allegation states that in September, 1983, the defendants convinced him to purchase 11,000 shares of "Computer Devices" by falsely and knowingly asserting that a French financing would bolster that company's prospects. On or about October 31, 1983, Computer Devices filed for protection under Chapter 11 of the Bankruptcy Code, and Rush alleges that the financing of which defendants informed Rush was never a reality.

Soon after October 31, 1983, Rush claims to have ordered the liquidation of all his securities at Oppenheimer.

## Discussion

Rush seeks to reinstate his civil RICO claim based upon a recent Supreme Court decision overturning the Second Circuit's construction of the Racketeer Influenced and Corrupt Organizations Act in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 741 F.2d 482 (2d Cir.), *rev'd,* — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In *Sedima,* the Second Circuit held that the plaintiff's complaint was insufficient to constitute a claim under civil RICO for two reasons. First, the Court held that the plaintiff failed to allege an injury stemming from an activity that RICO was designed to deter as distinguished from direct injury as a result of the predicate act violations. Second, Sedima's claim failed to allege that the defendant had been criminally convicted of the predicate acts of mail fraud and wire fraud, a requirement which it inferred from the reference in the civil cause of action section to a "violation" of § 1962, the section providing a list of prohibited criminal activities under the statute. *Id.* at 495–503.

Relying on the Second Circuit's construction of the civil RICO prerequisites in *Sedima,* this court dismissed Rush's civil RICO claim on the following grounds:

> Rush fails to allege the necessary requisites of a civil RICO case as recently redefined by this Circuit in *Sedima, S.P. R.L. v. Imrex Co., Inc.* [741 F.2d 482] 83–7965, slip op. (2d Cir. July 25, 1984). The prior criminal convictions of defendant that must be alleged as the predicate offenses are clearly not set forth. Nor is the special "racketeering injury," as defined in *Sedima, supra,* at 5561 [496], alleged by Rush. Count three is consequently dismissed.

On July 1, 1985, the Supreme Court reversed the Second Circuit's *Sedima* decision, holding that a plaintiff need not establish a "racketeering injury" as distinct from a violation of two or more predicate acts under the statute, and that civil RICO

actions do not require that plaintiff demonstrate that defendant was previously convicted of a predicate act or a RICO violation. In view of the fact that Rush's claim did not meet the Second Circuit's requirements for the pleading of a civil RICO action, this court did not consider whether the remaining aspects of Rush's claim met the substantive prerequisites for bringing such a claim.

### Statutory Background

RICO was enacted as a criminal statute aimed at preventing the infiltration of business enterprises by organized crime. *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Congress included a private right of action under the statute, "private civil RICO," to protect anyone injured "by reason of" a violation of the act, 18 U.S.C. § 1964(c) [1] which specifically requires a civil RICO plaintiff to establish the elements of the substantive RICO offense which it has allegedly been violated by the defendant, in this instance violations of sections 1962(a), (c), and (d). Section 1962(d) makes it unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of the same subsection, referring our inquiry back to section 1962(c) which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Such "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact or not a legal entity.[2] 18 U.S.C. § 1961(4). A "pattern of racketeering" is defined as the commission of two or more specified predicate criminal acts within a ten-year period, 18 U.S.C. § 1961(5), including the predicate acts which Rush alleges herein, mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. 18 U.S.C. § 1961(1)(A).

### Discussion

From these interwoven sections the Second Circuit has fashioned a private civil RICO "checklist," outlining the plaintiff's burden in attempting to allege a substantive RICO violation:

> First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c) (1976).

*Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983).

Rush contends that his amended complaint meets all these requirements for the pleading of a civil RICO claim. The defendants contend, however, that Rush's RICO claim is defective because it (1) fails to demonstrate that Oppenheimer is a proper defendant as Oppenheimer was not a principal or participant in the alleged violations; (2) fails to distinguish between a "person" and "enterprise" under the statute; (3) fails to allege a "pattern of racke-

---

1. Section 1964(c) provides:
   Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

2. The Supreme Court in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) made it clear that "enterprise" includes both legitimate and illegitimate businesses, and that the existence of both an "enterprise" and a "pattern of racketeering activity" are separate elements to be proved.

teering activity" in accordance with the Supreme Court's *Sedima* opinion; and (4) fails to adequately plead the existence of a RICO conspiracy. Each of these contentions will be addressed in turn.

## A. Oppenheimer as Defendant

Rush's amended pleadings seek to add a civil RICO claim against defendants to this action, naming Oppenheimer as both an "enterprise" and a "person" conducting the enterprise's affairs through a pattern of racketeering activity in violation of Section 1962(a) and (c). Rush contends that Oppenheimer can be both "enterprise" and "person" under the two sections of the statute because it received substantial income derived from Seskis' racketeering pattern and used the proceeds of this racketeering activity in the operation of the New York Plaza Office of Oppenheimer in violation of section 1962(a)[3] and conducted its own affairs through a pattern of racketeering in violation of section 1962(c). Oppenheimer contends that it cannot be named as a RICO defendant because Rush is required to differentiate between an enterprise and a person under § 1962(a) and (c), and that it cannot be a "person" who violated § 1962 because it did not actively or knowingly participate in Seskis' alleged frauds.

## 1. Liability for a 1962(c) Violation

■ Section 1962, which defines the elements for both criminal and civil RICO offenses, prohibits any "person" (including a corporation), employed by or associated with any interstate "enterprise," from conducting the affairs of this enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). This "pattern of racketeering activity" (established by the commission of at least two predicate acts defined by § 1961(5)) must have a nexus to the "enterprise" through which these acts are committed. *Moss v. Morgan Stanley*, 553 F.Supp. 1347, 1363 (S.D.N.Y.), *aff'd*, 719 F.2d 5, 17 (2d Cir.1983). The Second Circuit's test for establishing this nexus between the violations of section 1962 and the enterprise which forms the vehicle for the violation was set out in *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980) which provided:

> [o]ne conducts the activities of an enterprise through a pattern of racketeering when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise. Simply committing predicate acts which are unrelated to the enterprise or one's position within it would be insufficient.

The Second Circuit made it clear with the *Scotto* test that although a nexus exists between the "enterprise" and "person" violating the statute, they cannot be the same entity for the purpose of section 1962(c). The Supreme Court's opinion in *United States v. Turkette, supra*, 452 U.S. at 583, 101 S.Ct. at 2528, concurred with this interpretation of this section concluding "while the proof used to establish these separate elements may in particular cases coalesce,

---

**3.** Section 1962(a) entitled Prohibited Activities, provides in relevant part:

### § 1962. Prohibited activities

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

proof of one does not necessarily establish the other ... the existence of an enterprise at all times remains a separate element which must be proved." *Id.* at 583, 101 S.Ct. at 2528.

■ The portion of the amended complaint claiming a RICO violation under 1962(c) is therefore defective because it fails to distinguish between Oppenheimer as defendant "person" and Oppenheimer as the infiltrated "enterprise," a defect which courts in this Circuit and elsewhere have found fatally at odds with the language of the statute. *Bennett v. United States Trust Co.,* (and cases cited therein) 770 F.2d 308 (2d Cir.1985); *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350 (S.D.N.Y.1984); *Dakis ex rel. Dakis Pension Fund v. Chapman,* 574 F.Supp. 757 (N.D.Cal.1983); *Parnes v. Heinold Commodities, Inc.,* 548 F.Supp. 20, 23 (N.D.Ill. 1982). As the Second Circuit explained in *Bennett v. United States Trust Co. of New York, supra,* the separation of the "entity" and "person" is consistent with both the policy and language of the statute:

> As the above decisions point out, requiring a complaint to distinguish between the enterprise and the person conducting the affairs of the enterprise in the prohibited manner is supported by the plain language of section 1962(c), which clearly envisions two entities. Moreover, requiring a distinction between the enterprise and the person comports with legislative intent and policy. Such a distinction focuses on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.

770 F.2d at 315. (citations omitted).

■ Rush's amended complaint attempts to circumvent this 1962(c) pleading requirement by distinguishing Oppenheimer the defendant from Oppenheimer the enterprise, claiming that the "person" engaged in a pattern of racketeering activity is the larger corporation, while the "enterprise" through which the racketeering acts were conducted was Oppenheimer's One New York Plaza office. This distinction simply seeks to avoid the pleading requirements of section 1962.

The One New York Plaza office is Oppenheimer's central office, and is for these purposes indistinguishable in structure from the corporation as a whole. We agree with the Fourth Circuit's observations in *United States v. Computer Sciences Corp.,* 689 F.2d 1181 (4th Cir.1982), that while a legally separate entity is not necessary to make out a separate enterprise, carving out a "piece" of a corporate defendant to create a distinct "enterprise" will not satisfy the pleading of a civil RICO claim:

> There is however the remaining problem, ... of whether Congress ever intended, in 18 U.S.C. § 1962, that the statute prohibit activities by a person where the activities are described as occurring with any enterprise where there was identity between the person, on the one hand, and the enterprise, on the other. We conclude that enterprise was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit, and, failing that, to punish. To be sure, the analogy between individuals and fictive persons such as corporations is not exact. Still, we would not take very seriously, in the absence, at least, of very explicit statutory language, an assertion that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon. A corporation in common parlance is not regarded as distinct from its unincorporated divisions either.

689 F.2d at 1190. *See also Moss v. Morgan Stanley, supra,* 553 F.Supp. at 1360.

■ Further, Rush cannot rely on theories of *respondeat superior* to accomplish an end-run around this required distinction between person and enterprise under section 1962. Superimposing vicarious liability doctrines on the RICO criminality requirements would in this context permit the "enterprise" which is the conduit for these activities, to become the defendant by way of imputation, in a transparent attempt to reach a deeper pocket than the

actual violator or perpetrator of the predicate racketeering acts.

Rejection of this reasoning in the civil RICO context is not a matter of first impression. Most courts considering the issue have prevented this attempt to blur the enterprise/person distinction. For example in *Parnes v. Heinold Commodities, Inc.,* *supra,* 548 F.Supp. at 23–24, the district court observed that it would make little sense to hold a corporation liable for the alleged crimes of its lower level employees when the corporation appears to be a passive conduit or victim of the racketeering activity. In reaching the conclusion the court stated "By elementary principles of construction, the Section 1964(c) cause of action—a suit for 'violation' of section 1962 —must be asserted against the violator under the latter section. The violator is the person' that has engaged in the 'unlawful' conduct. It would be an obvious distortion to permit suit against the 'enterprise' that had itself been infiltrated by the 'unlawful' conduct or participation of the 'person'—the 'enterprise' that may itself have been a victim of the racketeering activity." *Id.* at 23–24. The *Parnes* Court noted, "That sort of respondeat superior application, perhaps reasonable to establish ordinary civil liability, would be bizzare indeed as a means to warp the facts alleged in this case into the RICO mold." *Id.* at 24. The Seventh Circuit endorsed this resolution of the question of vicarious liability for civil RICO predicate acts in *Haroco v. American National Bank & Trust Co.,* 747 F.2d 384, 402 n. 20 (7th Cir.1984), *aff'd on other grounds,* —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), by dismissing the notion that *respondeat superior* liability could operate to make a corporate enterprise vicariously liable under section 1962(c) for violations of the predicate acts.

In a number of cases this analysis has been applied to dismiss claims which name the enterprise as co-defendant for the alleged predicate RICO act violations of its employees. *See, e.g., Schofield v. First Commodity Corp.,* No. 83–4137–Z (D.Mass. April 29, 1985); *Northern Trust Bank/O'Hare N.A. v. Inryco.,* 615 F.Supp. 828, 835 (D.C.Ill.1985). For example, in *Dakis ex rel. Dakis Pension Fund v. Chapman, supra,* 574 F.Supp. 757, the plaintiff charged two brokerage firms with vicarious RICO liability for the alleged "churning" of a customers' account by the account executive. The *Dakis* Court, recognizing that the brokerage firms were only conduits for the churning, refused to make the "quantum leap" from the acts of a lower level corporate employee to vicarious corporate liability under civil RICO:

> It would be an anomalous result indeed if, because Chapman had misused his authority to trade the accounts, and had actually violated internal guidelines of the firms by so doing, the firms were nonetheless deemed "aggressor" enterprises liable under RICO. At most plaintiff's allegations portray the firms as essentially legitimate businesses which permitted themselves to act as the "conduits" for Chapman's securities violations. The firms, as well as the plaintiff, suffered direct economic harm from Chapman's deeds: the loss of her two accounts, as well as any liability to which they are held under the securities laws for plaintiff's action here. Interestingly, we suggest that the firms, more than the plaintiff, may be proper plaintiffs of a RICO action against Chapman; under the present allegations, the firms would appear to satisfy the three-pronged standing requirement of (1) being otherwise legitimate business enterprises; (2) which have been either metaphysically infiltrated or competitively injured; (3) by another's commission of two predicate offenses within a period of ten years.

The two cases upon which Rush relies to support his belief that Oppenheimer can be vicariously lible for Seskis' acts are inapposite to this context. In *Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985), the district court of Maryland imputed liability under RICO for the predicate acts of its employees, however, the "person" (Cohen) was the sole shareholder of one of the "enterprises" and the general partner of the other

two, a relationship so intertwined that the court could hold that "Cohen [and the corporate defendants] each conducted or participated in the conduct of the enterprises' affairs within the meaning of RICO" *Id.* at 811. Thus vicarious liability followed from the factual finding that the "enterprise" was controlled by the "persons" violating the RICO statute, an inter-relationship which approaches the [*U.S. v.*] *Hartley* [678 F.2d 961 (11th Cir.1982)] test (for a 1962(a) violation) of corporation as the "central figure" in the fraudulent acts, and which justifies the change in role from "passive instrument" to "central figure." *See Haroco v. American National Bank & Trust Co., supra* 747 F.2d at 401. Discussed in Part B *infra.*

Similarly in *Bernstein v. I.D.T. Corp.,* 582 F.Supp. 1079 (D.Del.1984) where the court found that vicarious liability in the civil RICO context, the non-corporate defendants in the case were leading officers and directors of the named corporations and were not lower level employees of the corporation. Furthermore, the vicarious liability analysis in *Bernstein* seems flawed by the court's statement that it did not need to reach the question of implied criminal liability because the case at bar rested on civil RICO violations. *Id.* at 1083. This failure to perceive that the civil liability under RICO rests on the violations of the criminal predicate acts which form a pattern of racketeering activity under section 1962 undermines the policy analysis of this court. In short, under the fact alleged by Rush in his amended complaint, Oppenheimer cannot be named as both "enterprise" and "person" under 1962(c) and cannot be a vicarious violator of the criminal predicate acts.[4]

## B. The 1962(a) Claim

Rush contends that Oppenheimer received substantial income derived directly and indirectly from Seskis' racketeering activities, and invested such proceeds in Oppenheimer the "enterprise" in violation of Section 1962(a). Rush claims that even if this court imposes a separate pleading requirement for "persons" and "enterprise" under section 1962(a), the same is not required for pleading violations of section 1962(a). According to Rush, the court should undertake an *ad hoc* analysis of the "role" which the corporation has played in the alleged fraudulent scheme to determine whether in each instance the corporation is both recipient of the racketeering profits and perpetrator of the fraud. While this type of inquiry might be appropriate if the statute had intended to punish the enterprises infiltrated by the racketeering activity, it is an inappropriate inquiry for a statute aimed at punishing the perpetrators of the criminal acts.

The language of section 1962(a) requires the presence of the same elements as a section 1962(c) claim—an "enterprise," a "pattern of racketeering activity," and a "person" violating the predicate acts—only the relationship among these elements differs. Section 1962(a) provides in relevant part "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce ..." Thus where section 1962(c) envisions the racketeering acts conducted through the

---

**4.** Rush contends that Oppenheimer can be held vicariously liable for RICO predicate acts of Seskis as a result of its status as "control person" under section 20 of the Securities Exchange Act, 15 U.S.C. Section 78t (1976). However, in *Moss v. Morgan Stanley,* 553 F.Supp. 1347, 1362 (S.D.N.Y.), *aff'd* 719 F.2d 5 (2d Cir. 1983), the court stated that "There is no possible argument that Morgan Stanley is criminally liable for the acts of anyone by reason of section 20(b) of the securities Exchange Act, 15 U.S.C. Section 78t(b). That section has been construed as requiring a showing that the controlling person ... knowingly used the controlled person to commit the legal act." (citations omitted). Vicarious liability for criminal acts under § 20(b) therefore requires allegations of knowledge and participation not present in Rush's amended complaint.

enterprise, section 1962(a) portrays the enterprise as the investment object of the criminal violators. The Seventh Circuit Court of Appeals in *Haroco v. American National Bank and Trust Company,* 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) focused on this difference to reconcile what it viewed as a statutory tension: the recognition that passive enterprises victimized by the fraudulent or racketeering acts of its employees should not be named as persons or violators of the statute, and the desire to prosecute corporations which are the alter-egos of the criminal perpetrators but which protect the racketeering profits from the reach of fraud victims. The *Haroco* court concluded that the language of section 1962(c) required the distinct pleading of "person" and enterprise, because the former had to accomplish its pattern of racketeering through the use of the latter, two different roles in the criminal scheme which could not be engaged in simultaneously by one actor.

■ According to the Seventh Circuit, section 1962(a), however, required no temporal nexus between the violator and the enterprise; the person merely had to invest the tainted proceeds in the enterprise. The absence of this nexus permits the defendant to be both the racketeer and the enterprise investing in itself:

> Subsection (a) does not contain any of the language in subsection (c) which suggests that the liable person and the enterprise must be separate. Under subsection (a) therefore, the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations. This approach to subsection (a) thus makes the corporation-enterprise liable under RICO when the corporation is actually the direct or indirect beneficiary of the pattern of racketeering activity, but not when it is merely the victim, prize, or passive instrument of racketeering. This result is in accord with the primary purpose of RICO, which after all, is to reach those who ultimately prof-

it from racketeering, not those who are victimized by it.

*Id.* at 401–02 (footnotes omitted). *Accord, Bruss v. Allnet Communication Services, Inc.,* 606 F.Supp. 401 (N.D.Ill.1985).

However, a review of this distinction between the language of sections 1962(a) and (c) leads this court to the opposite conclusion. One can interpret the lack of a required nexus between person and enterprise in section 1962(a) to indicate the need for a more distinct pleading of enterprise and statute violator because the statute contemplates an enterprise which can be entirely unrelated to the predicate acts. While section 1962(c) contemplates a perpetrator working through the legitimate or illegitimate enterprise in further of a racketeering scheme, a section 1962(a) "enterprise" can be the bounty purchased with the racketeering profits, the entity used to "launder" the ill-gotten gains. Therefore, if it is inappropriate to plead identity in 1962(c), it is then inappropriate to plead it under section 1962(a), particularly in light of our knowledge that the statute was not intended to convict the infiltrated enterprise but the violator of the predicate acts. *See Cashco Oil v. Moses,* 605 F.Supp. 70, 71 (N.D.Ill.1985) (*Haroco* permits the concepts of enterprise and person to be mixed in a somewhat doubtful fashion). The fact that these two subsections use exactly the same terms for each actor in the criminal episode further supports a belief that such a compromise between competing goals cannot be superimposed on different subsections of the same statutory section. This conclusion reiterates the court's pre *Haroco* conclusion in *Kaufman v. Chase Manhattan Bank N.A.,* 581 F.Supp. 350, 356–57 (S.D.N.Y.1984). This interpretation would aggravate the already hopeless deviation of the RICO statute from its intended purpose in ferreting out organized crime. *See Sedima S.P.R.L. v. Imrex Co., Inc., supra,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

In his amended complaint Rush has not pleaded such an infiltration or participation by Oppenheimer in the alleged Seskis

fraud, but relies heavily on concepts of vicarious liability to hold Oppenheimer responsible for the acts of its employee. Rush asserts that Oppenheimer strenuously pushed Seskis to obtain brokerage income for Oppenheimer, that Seskis was eventually terminated because of his failure to produce sufficient brokerage commissions and that Oppenheimer's good reputation induced the general public to rely on its employee Seskis. Even when viewed in a light most favorable to Rush's claims, these allegations describe Oppenheimer as distant and demanding employer but not as a direct participant in the alleged fraud of its employee. These allegations do not support the contention that Oppenheimer participated as a principal in the predicate acts as required by the *Haroco* Court to permit Oppenheimer the "enterprise" to be equated with a "person" who has actively committed the predicate racketeering acts outlined in section 1961(5).[5]

### A Pattern of Racketeering Activity

■ The defendants contend that Rush has not adequately pleaded facts demonstrating the existence of a "pattern" of racketeering activity. Section 1961(5) defines a "pattern of racketeering activity" as at least two "acts of racketeering activity" within a ten-year period, and sections 1961(1)(A) and (D) and specify mail fraud, wire fraud, and fraud in the sale of securities as acts of racketeering. Oppenheimer and Seskis contend that Rush's "churning" allegations, and the allegedly fraudulent sales of shares in Computer Devices do not meet the latest standards set by the Supreme Court in its *Sedima* opinion for the demonstration of such a pattern.[6] However, Rush's amended pleadings do meet the standards of both the Second Circuit and the Supreme Court's *Sedima* footnote for the existence of a pattern of racketeering activity

Oppenheimer and Seskis contend that Footnote 14 of the Supreme Court's *Sedima* opinion, endorsing a concept of "continuity plus relationship," narrows this Circuit's definition of a pattern and precludes a finding of a pattern in this instance. In *Sedima* the Court quoted with approval from a Senate and House Report:

> The target of [RICO] is thus not sporadic activity. The infiltration of legitimate

5. Rush also claims that Oppenheimer violated section 1962(d) which provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." The above conclusions concerning Oppenheimer's lack of participation in the predicate acts under sections 1962(a) and (c) also preclude a finding of conspiracy to violate those same subsections. In order to properly allege a conspiracy to violate subsections (a), (b) or (c), Rush must assert that Oppenheimer "by his words or his actions ... objectively manifested an agreement to participate directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate acts." *Chambers Development Co. v. Browning Ferris Industries,* 590 F.Supp. 1528 (W.D.Pa.1984) (quoting *Eaby v. Richmond,* 561 F.Supp. 131 (E.D.Pa.1983)). "Such allegations must delineate among the defendants 'as to their participation or responsibilities in making the statements which are the subject of the suit." *Van Schaick v. Church of Scientology,* 535 F.Supp. 1125, 1141 (D.Mass.1982). Most courts have held a corporation incapable of a RICO conspiracy with its employees, *see McClendon v. Continental Group, Inc.,* 602 F.Supp. 1492, 1510 (D.N.J.1985); *Chambers Development Co. v. Browning Ferris Industries, supra,* 590 F.Supp.

1528, 1541–42 (W.D.Pa.1984), except in instances when the corporate veil was acting to shield a corporation infiltrated at its highest levels by racketeering activity. *Mauriber v. Shearson American Express, Inc.,* 567 F.Supp. 1231, 1241 (S.D.N.Y.1983). (Intra-corporate RICO conspiracy can exist because the underlying acts of the civil conspiracy occur in a criminal context). Furthermore, as the Third Circuit court succinctly stated in *Seville Industrial Machinery Co. v. Southmost Machinery,* 742 F.2d 786, 792 n. 8 (3d Cir.1984) "Seville's complaint alleges only that the defendants conspired to commit the acts of fraud that constitute the alleged pattern of racketeering activity. As the district court correctly noted, § 1962(d) prohibits conspiracies to knowingly further the affairs of the enterprise." Mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d).

6. Rush lists the securities law violations found against Oppenheimer in *Miley v. Oppenheimer & Co., Inc.,* 637 F.2d 318 (5th Cir.1981) as one predicate act of racketeering under the RICO statute. Because this court holds that Oppenheimer cannot be named here as a violator of RICO, this predicate act allegation will not be included in the "pattern" analysis.

business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern ...

Significantly, in defining pattern in the same bill, Congress was more enlightening: 'criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'

*Id.* at n. 14 (emphasis in original).

This court agrees that the above quoted *Sedima* language signals the courts of this Circuit to place increased emphasis on certain competing strains of "pattern" analysis. The current Second Circuit standards for establishing a "pattern of racketeering activity" can be characterized as a continuum test. On one end of the spectrum is the requirement that the predicate acts bear some relationship to each other, so that the statute is not used to punish sporadic or disjointed criminal violations. Although the Second Circuit has not endorsed the specific requirement that the predicate acts be related to each other in the sense of possessing a "unitary character" *United States v. Weisman*, 624 F.2d 1118, 1122 (2d Cir.1980), the Court noted that the requirements that the pattern be done in the conduct of the enterprise and that the acts be temporally related prevents the application of the statute to sporadic and unrelated criminal acts. *Id.* While the *Weisman* Court criticized the district court's opinion in *United States v. Stofsky*, 409 F.Supp. 609, 614 (S.D.N.Y.1973), holding that "pattern" should be construed to require that the predicate acts of racketeering be "connected with each other by some common scheme, plan or motive," this criticism should be reconsidered in light of the Supreme Court's observation that Congress emphasized in drafting the pattern requirement "criminal acts that have the same or similar purposes, results, victims, or methods of commission, or otherwise are in-

terrelated by distinguishing characteristics and are not isolated events." *Sedima S.P. R.L. v. Imex Co., supra,* 105 S.Ct. at 3285 n. 14.

At the other end of the "pattern" spectrum is the Supreme Court's "continuity" requirement, the requirement that the pattern be constituted by acts which evidence the "threat of continuing activity" which the statute was designed to prevent. *Id.* at 14. Prior to *Sedima*, the courts of this Circuit have held that when the predicate criminal acts are part of one scheme to defraud, the common victim provides a link between predicate acts which permit them to constitute a "pattern" under the statute, *United States v. Chovanec*, 467 F.Supp. 41, 44 (S.D.N.Y.1979) (six incidents of wire fraud over a four-week period in an attempt to defraud one victim is a pattern of racketeering activity), and that a pattern can be demonstrated by predicate acts which constitute a single criminal transaction. *United States v. Parness*, 503 F.2d 430 (2d Cir.1974), *see also, Kaufman v. Chase Manhattan Bank, N.A.*, 581 F.Supp. 350 (S.D.N.Y.1984) (citing *Chovanec* to find a pattern of racketeering activity established from mail fraud in furtherance of one criminal scheme). However, the Supreme Court's enhancement of the "continuity" aspect of the pattern requirement casts doubt on the continued validity of cases which carve one criminal episode into multiple predicate act "pieces" and allege a "pattern" within the meaning of the statute. The Second Circuit, even before the Supreme Court's *Sedima* opinion, had begun to question the appropriateness of holding that a "pattern" can be comprised of predicate act segments of one criminal project. *See, e.g., United States v. Weisman*, 624 F.2d 1118, 1123 (discussing the specter of an unintended RICO application caused by the multiplicity of predicate acts arising from a single substantive offense); *United States v. Young*, 745 F.2d 733, 767 n. 1 (2d Cir.1984) (predicate violations required for a criminal enterprise offense under 21 U.S.C. § 848 must be substantially distinct in time and place and if too

closely related might not be a "series" of three violations under the statute).

Whatever the outcome of these shifting emphases in the "pattern" requirement, the facts alleged in Rush's amended complaint demonstrate that Rush has adequately pleaded the existence of a "pattern" under these standards.

Seskis' alleged fraudulent acts have consisted of multiple predicate acts of racketeering under the statute, including discrete allegations of "churning," misrepresentations as to the riskiness, the profitability, and the type of activity being conducted in the account, and deceptions as to Seskis' own skills and the unique nature of his services. These predicate acts, stretching over a period of eighteen months, evidence the requisite continuity to constitute a pattern of racketeering activity, without consisting of one criminal act divided into component pieces in order to satisfy the quantitative demands of the statute. Furthermore, Seskis' alleged actions satisfy the "relationship" prong of the pattern inquiry, as they possessed the same "purposes results, victims or methods", namely the alleged attempt to defraud Rush out of his stock equity.

**Pleading Fraud with Particularity**

Defendants' contention that Rush has not pleaded fraud with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b) is also without merit. While a vague reference to the underlying securities fraud allegations will not be sufficient exposition of the basis of a RICO allegation, *Mauriber v. Shearson/American Express, Inc.*, 546 F.Supp. 391, 397 (S.D.N.Y.1982), Rush's amended complaint, drafted in response to this court's July 6, 1984 request for a more particular categorization of his claims, sets out sufficient detail to withstand a Rule 9(b) challenge. The amended complaint has given defendants fair notice of the nature and grounds of Rush's claims, *Ross v. A.H. Robins Co.*, 607 F.2d 545 (2d Cir.1979), and any reputational harm to Seskis which stems from the allegation of this RICO offense has already been caused by the allegations of fraud

held properly plead by this court in its August 24, 1984 opinion. *Rush v. Oppenheimer, supra,* 592 F.Supp. at 1108 (S.D.N.Y.1984).

For the aforementioned reasons, Rush is granted leave to add a civil RICO claim only against defendant Seskis to his amended complaint.

IT IS SO ORDERED.