**SJ ADVANCED TECHNOLOGY & MANUFACTURING CORP., Plaintiff,**

v.

**Edward JUNKUNC, et al., Defendants.**

**No. 85 C 4575.**

United States District Court,
N.D. Illinois, E.D.

Jan. 29, 1986.

Robert J. Pavich, Michael D. Monico, Barry A. Spevack, Monico & Pavich, Chicago, Ill., for plaintiff.

Richard K. Wray, Richard L. Rosen, Yvor E. Stoakley, Arnstein, Gluck, Lehr, Barron & Milligan, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

SJ Advanced Technology & Manufacturing Corp. ("SJ") has filed a seven-count Amended Complaint (the "Complaint" [1]) against Edward Junkunc, Laddie Junkunc and Helen Steirer—individually and doing business as General Machinery and Manufacturing Co. ("General")—charging violations of:

1. the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Count One);

2. Clayton Act § 3, 15 U.S.C. § 14 (Count Two); and

3. Sherman Act § 2, 15 U.S.C. § 2 (Count Three);

and advancing an assortment of related state-law claims (Counts Four through Seven). Defendants have now moved under Fed.R.Civ.P. ("Rules") 9(b) and 12(b)(6) to dismiss the Complaint and to strike certain of its allegations. For the reasons stated in this memorandum opinion and order, the motion is granted in part but denied in principal part.

### Facts [2]

General manufactures various hardware products and aircraft jet engine components, including precision-machined fuel nozzle seals or gaskets ("seals") (¶ 9). It produces seals particularly for jet engines manufactured by United Technologies Pratt & Whitney Aircraft Group ("United") (¶ 12). Until 1979 General sold all its seals to United and was the sole supplier of all seals produced in the United States (*id.*). United resells the seals to different branches of the United States Armed Services, the only ultimate users of seals (¶ 13). No other United States market exists for seals (¶ 35).

General has always been a family-owned business, having been founded over 50 years ago by Stephen Junkunc II, the father of all three individual defendants and of Stephen Junkunc III (¶ 6). After the founder's death, his four children owned and operated the business (*id.*).

---

1. All references to portions of the Complaint in this opinion will omit the name of the pleading itself, simply taking the form "Count—" or "¶ —."

2. For purposes of the motion to dismiss, this Court has accepted as true the Complaint's well-pleaded factual allegations, drawing all reasonable factual inferences in favor of SJ. *Wolfolk v. Rivera*, 729 F.2d 1114, 1116 (7th Cir.1984).

Stephen Junkunc IV ("Junkunc"), grandson of the founder and son of Stephen III, was also a long-time employee of General (¶ 7). In July 1979, 14 months after his father's death, Junkunc resigned from General because of harassment by other family members (¶ 10). After his departure, he incorporated SJ and began preparations for the competitive manufacture of seals (¶ 11).

In October 1979 Junkunc called on United to discuss his business plans (¶ 14). United responded by asking SJ to develop new seal designs and to submit samples, with particular reference to one specific product (¶ 15). Discussions continued (¶¶ 16–17), and in June 1980 United representatives inspected SJ's facility and indicated SJ would require very little guidance to qualify as an "A–1 vendor" (¶ 18). But throughout 1980 General communicated with both United and SJ's potential suppliers, misrepresenting (¶¶ 20, 22):

"(a) That plaintiff was in a distressed financial condition, under capitalized, and incapable of manufacturing seals on a continuing and reliable basis;

"(b) That plaintiff could not meet the requirements of its customers;

"(c) That plaintiff was not capable of manufacturing seals that would pass United quality assurance standards;

"(d) That plaintiff would soon be out of business;

"(e) That plaintiff had stolen "proprietary material" or "trade secrets" from General and was illegally using them to manufacture seals; and/or,

"(f) That in the event others contacted by plaintiff did business with plaintiff then they would cause General to cease doing business with those persons."

Those misrepresentations succeeded in causing United to cease its discussions with SJ (¶ 25).

In September 1982 SJ turned to the United States Air Force to request information about supplying seals directly to the Air Force (¶ 26). In March 1983 the Air Force approved SJ as a qualified seal supplier (¶ 28). Beginning in late 1982 and continuing through 1984, General telephoned Air Force representatives in Oklahoma and made disparaging statements substantially similar to those made to United in 1980 (¶¶ 29, 33).

In mid–1983 SJ met with United States Navy representatives to discuss supplying seals directly to the Navy (¶ 31). In response, the Navy provided SJ with the necessary information to become an approved seal supplier (¶ 32), and in August 1984 the Navy awarded SJ a contract to manufacture seals (¶ 38). During 1984 General made the same malicious misrepresentations to Navy personnel (¶ 33).

In each instance General's misrepresentations were communicated by telephone or mail and in interstate commerce. General has pursued its course of conduct to deter customers from doing business with SJ and to maintain General's status as the sole supplier of seals in the United States (¶¶ 21, 24, 30 and 34).

### General's Contentions

General has launched multiple attacks on each of SJ's federal claims:

1. Count One assertedly:

(a) fails to allege the elements of common-law fraud;

(b) fails to set out the alleged fraudulent activity with the particularity required by Rule 9(b); and

(c) fails to allege a "pattern" of "racketeering activity."

2. Count Two purportedly:

(a) is barred by the statute of limitations in 15 U.S.C. § 15b; and

(b) fails adequately to allege an "agreement" and an "anticompetitive effect."

3. Count Three allegedly:

(a) fails adequately to identify the relevant product and geographic markets monopolized by General; and

(b) fails to assert any anticompetitive effects.

General also seeks to strike (¶¶ 39–41, which deal with General's institution of state court litigation against SJ and are the sole support of Count Seven.

## Count One: RICO

SJ's principal reliance for its RICO claim is on General's asserted violations of the federal mail fraud and wire fraud statutes discussed below.[3] General urges such reliance requires a showing of each element of common-law fraud (in addition to use of the means of communication conferring federal jurisdiction). And in that respect General correctly says SJ has alleged General's factual misrepresentations not to SJ itself, but only to third parties: United, SJ's suppliers, the Air Force and the Navy. As General would have it, such allegations of false assertions to third persons do not suffice to charge an underlying fraudulent scheme in RICO terms. Though SJ's responsive analysis is equally off base, General's argument must fail in light of the Complaint's allegations.

RICO § 1962(a)[4] renders unlawful (among other things) the operation of an enterprise engaged in, or whose activities affect, interstate commerce, where the person operating the enterprise uses any income derived by that person "from a pattern of racketeering activity." RICO § 1961(1) defines "racketeering activity" as any of a large number of specified illegal acts, including "any act which is indictable under ... [18 U.S.C.] section 1341 (relating to mail fraud) [or 18 U.S.C.] section 1343 (relating to wire fraud)."

■ Before this opinion turns to the latter subject, which has been the focal point of the parties' presentations, a word is in order as to other allegations necessary for a claim under RICO § 1962(a): (1) the relationship between the individual defendants as the RICO "persons" and General as their "enterprise," (2) the individuals' having derived income from the "racketeering activity" and (3) the use of that income in

the enterprise's operation. All SJ has said on that score, apart from alleging the individuals' ownership of General (¶ 5), is (¶ 44):

> By reason of the foregoing conduct, defendants have violated section 2(a) of the Racketeer Influenced and Corrupt Organizations Act by engaging in wire fraud, 18 U.S.C. sec. 1343, interference with interstate commerce, 18 U.S.C. sec. 1951, and mail fraud, 18 U.S.C. sec. 1341, on two or more occasions, as part of a pattern of racketeering activity.

Because General is a partnership, that conclusory allegation might well raise an inference about the individuals' derivation of income from General's wrongdoing, followed by their reinvestment and use of those funds in General's operation. But a defendant is entitled to rely on more than guesswork (even educated guesswork) on such necessary components of a claim. Accordingly this opinion's upholding of Count One is conditioned on SJ's tendering of specific allegations on or before February 7, 1986 to flesh out the applicability of RICO § 1962(a).

■ To return to the litigants' main bone of contention, a mail or wire fraud violation—and hence any derivative violation of the rights of a RICO victim—requires two elements:

1. a scheme to defraud; and

2. the use of the mails or the wires to further that scheme.

See, e.g., *United States v. Shelton*, 669 F.2d 446, 454–55 (7th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). SJ's Complaint establishes both those elements, though not in the way SJ's memorandum argues.

---

**3.** Neither SJ's Complaint nor its briefing on the current motion reflects real care. Complaint Count One (¶ 44) also charged violations of 18 U.S.C. § 1951 (the Hobbs Act). When it came to briefing the current motion, though, SJ Mem. 3 referred instead to "Travel Act [18 U.S.C. § 1952] violations." But whichever SJ really means, it takes only a simple reading of both the Hobbs Act and the Travel Act to see SJ's Complaint tracks neither. Accordingly SJ's

RICO claim must survive on the fraud charges or not at all.

**4.** Complaint Count One (¶ 44) refers to "section 2(a)" of RICO. For ease in reference to the statute in its most readily available form (as part of Title 28), this opinion's citations will employ the different form just used in the text.

*Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) identifies the Illinois version of the familiar five elements essential to a cause of action for fraudulent misrepresentation:

> (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

It is plain from this opinion's factual recital that the Complaint alleges each of those elements:

> 1 and 2.  General knowingly made false statements to United, SJ's suppliers, the Air Force and the Navy (¶¶ 20, 22, 29 and 33).
>
> 3.  General made those misrepresentations intending to induce the recipients' refusals to conduct any business with SJ (¶¶ 21, 23, 30 and 34).
>
> 4.  Those misrepresentations caused at least United to cease its discussions with SJ (¶ 25).[5]
>
> 5.  SJ's allegation of General's monopoly status creates at least the reasonable inference that General's false statements damaged United (for example) by causing it to refuse to deal with a company (SJ) that could otherwise have offered a competitive (more favorable) price.

In sum, SJ's Complaint plainly alleges a "scheme to defraud" United, the Air Force and the Navy.[6] And as to the second component essential to an act of racketeering activity, in each instance General communicated its misrepresentations by telephone or mail and in interstate commerce.  Thus the Complaint's allegations are adequate to establish mail and wire fraud as the predicate acts underlying SJ's RICO claim.

■ None of the foregoing analysis, obvious though it is, finds its way into the parties' memoranda.  Instead they debate a false issue: General insists SJ must allege General's acts defrauded SJ itself, while SJ accepts that proposition and tries unsuccessfully to demonstrate how that is so. But RICO § 1964(c) simply requires SJ to establish it is a "person injured in [its] business or property by reason of" the predicate acts of mail and wire fraud.  Given General's asserted monopoly status, together with the specific goal of its misrepresentations (though made to third parties) to exclude SJ as General's sole prospective competitor in the seal market, SJ clearly fits that "person injured" description. Nothing blocks an injured competitor from calling on civil RICO; see *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 457 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed. 145 (1982).

■ Defendants also challenge Count One as not meeting RICO's "pattern of racketeering activity" requirement.  RICO § 1961(5) identifies the statute's necessary, though not sufficient, "pattern" prerequisite:

> "[P]attern of racketeering activity" requires at least two acts of racketeering activity . . . .

Because that statutory definition marks out only the minimum requirement for that concept, *Sedima* invited a judicial picking-out process to give further content to the "pattern" standard.  This Court has since spoken to that issue by suggesting an appropriate approach in *Northern Trust*

---

5. Once again the lack of thought by SJ's counsel in drafting the Complaint poses difficulties.  It is unclear whether any of the other recipients of General's misrepresentations also acted in reliance on them.  Nor can it be told whether SJ may run afoul of RICO's statute of limitations (see, e.g., *Electronic Relays (India) Pvt. Ltd. v. Pascente,* 610 F.Supp. 648 (N.D.Ill.1985)).  Only the liberal reading of complaints taught by *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) saves SJ (at least for the time being) from those and other possible problems.

6. SJ has sufficiently identified the content of the alleged fraudulent statements, by whom and to whom they were made and the range of dates on which they occurred.  SJ need not plead its detailed evidence (available to General via discovery) to satisfy *Tomera v. Galt,* 511 F.2d 504, 508 (7th Cir.1975).  General's attempted invocation of Rule 9(b) is therefore unavailing.

*Bank/O'Hare, N.A. v. Inryco, Inc.,* 615 F.Supp. 828, 831–33 (N.D.Ill.1985).

Here General seeks to enlist *Inryco* in its own support, but SJ clearly has the better of the argument. Certainly (¶¶ 20, 22, 29 and 33 allege multiple acts of mail and wire fraud. And General is alleged to have made a like set of malicious misrepresentations to several different parties: United, SJ's suppliers, the Air Force and the Navy. True enough, General is said to have intended each time to injure SJ's competitive opportunities, but it sought to do so by defrauding a series of victims. Its separate acts of fraud on various separate parties contrast sharply with the mere mailing of more than one letter to implement a single kickback scheme (the situation in *Inryco*). Thus General's acts do constitute a "pattern" under *Inryco*, 615 F.Supp. at 831 (emphasis in original):

> True enough, "pattern" connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But "pattern" also connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal *activity*, not merely repeated *acts* to carry out the *same* criminal activity.

And see *Papagiannis v. Pontikes,* 108 F.R.D. 177, 178–79 (N.D.Ill.1985); *United States v. Yonan,* 622 F.Supp. 721, 728–29 (N.D.Ill.1985); *Graham v. Slaughter,* 624 F.Supp. 222, 224–25 (N.D.Ill.1985).

### Count Two: Clayton Act § 3

■ Count Two (¶ 46) charges General agreed with United that the latter would refuse to deal with SJ in violation of 15 U.S.C. § 14. General contends that claim is barred by the Clayton Act's statute of limitations, 15 U.S.C. § 15b:

> Any action to enforce any cause of action under sections 15 or 15a of this title shall be forever barred unless commenced within four years after the cause of action accrued.

For limitations purposes, a "cause of action" accrues each time a defendant commits an act that injures a plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338–39, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Accordingly Count Two can survive only if some act by General injurious to SJ's business occurred after May 9, 1981.[7]

Unsurprisingly, General contends SJ has failed to allege any acts in support of Count Two falling within the limitations period. SJ counters that:

1. General's actions constituted a "continuing" violation of the Clayton Act.

2. At least one allegation (¶ 31) identifies overt acts occurring in mid-1983.

Neither of those positions withstands analysis.

First, even when a plaintiff charges a continuing violation, the statute of limitations begins to run from the time of the last overt act causing injury to the plaintiff. *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.,* 546 F.2d 570, 572–73 (4th Cir.1976). As *Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117, 128 (5th Cir.1978) put it:

> It remains clear nonetheless that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.

Hence SJ must allege some act of General during the limitations period that constituted an exclusive dealing agreement prohibited by Clayton Act § 3. But only ¶ 20 identifies any overt acts by General calculated to induce United to refuse to deal with SJ—and those acts allegedly occurred "[i]n and throughout the year 1980." All ¶ 25 goes on to say is this:

> Thereafter, as a result of defendants' efforts, United ceased discussions with SJ ADVANCED TECHNOLOGY & MANUFACTURING CORPORATION.

_____

7. SJ initially filed this action May 10, 1985.

Although SJ has thus alleged an absence of dealing between SJ and United, it has conspicuously failed to allege any post-1980 act by General to procure that result. SJ's mere intonation of the words "continuing violation" cannot overcome that fatal flaw.

SJ nonetheless urges ¶ 31 alleges the requisite post-limitations overt acts:

> 31. In or about the middle of 1983, SJ ADVANCED TECHNOLOGY & MANUFACTURING CORPORATION contacted the United States Navy and requested information that would enable plaintiff to supply seals to the United States Navy directly.

That notion is utterly without merit, for ¶ 31 speaks solely of SJ's *own* actions. Each remaining Complaint reference to General's conduct involves General's alleged communications with the Air Force and the Navy, *not* its exclusive dealing agreement with United.

Accordingly, Count Two fails to meet the statute of limitations requirements of 15 U.S.C. § 15b. That conclusion obviates any need to discuss General's claim that Count Two also fails adequately to allege an "agreement" and an "anticompetitive effect." Count Two is dismissed.

### Count Three: Sherman Act § 2

Count Three sets out a claim for attempted monopolization. Such a claim requires three elements:

> 1. a specific intent to gain the power to control prices or to exclude competition in a line of commerce;
> 2. predatory or anticompetitive conduct engaged in to further the purpose to monopolize; and
> 3. a dangerous probability of success in the relevant market.

*Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 270 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). General attacks the sufficiency of SJ's allegations of the first and third factors.[8]

### 1. Specific Intent

■ It is difficult to understand General's first line of attack, in light of the identical allegations of ¶¶ 21, 24, 30, 34 and 40:

> Defendant made these false representations for the sole purposes of deterring [United, potential suppliers to SJ,] the United States Air Force and United States Navy from doing business with SJ ADVANCED TECHNOLOGY & MANUFACTURING CORPORATION and depriving it of income from the manufacture and sale of seals, and of maintaining General's own status as sole manufacturer and supplier of seals in the United States.

It does no credit to General's lawyers for them to insist (R.Mem. 11) no specific intent to monopolize has been asserted.

### 2. Relevant Markets

■ General also says SJ has not identified the relevant product and geographic markets. But ¶ 9 specifies the product market as a certain type of "aircraft jet engine component": "metal rings ... referred to as 'fuel nozzle seals' or gaskets...." And ¶ 35 identifies the relevant geographic market:

> Outside the Armed Services in the United States, there is no market for these seals.

Those allegations withstand dismissal at this pleading stage.

### 3. Probability of Success

■ General finally argues SJ has failed to allege General's "dangerous probability of success." But ¶ 12 asserts:

---

**8.** General also contends the four-year statute of limitations bars consideration of SJ's allegations as to United in support of Count Three. But SJ's Sherman Act § 2 monopolization claim derives from General's alleged conduct toward each of SJ's prospective customers, attempting to shoot down each one as it emerged. Such a claim has a far better call on the label of "continuing violation" than Count Two's exclusive dealing claim. Because SJ has unquestionably alleged overt acts by General within the limitations period in support of Count Three, the four-year statute of limitations does not bar reliance on General's contacts with United to support Count Three.

Until the inception of SJ ADVANCED TECHNOLOGY & MANUFACTURING CORPORATION, General ... was the sole source and supplier of these seals in the United States.

That factual allegation supports SJ's later conclusory assertion (¶ 42):

General will monopolize the seals' market in the United States.

*General Electric Co. v. Bucyrus-Erie Co.,* 563 F.Supp. 970, 977 (S.D.N.Y.1983) (citations omitted) confirms the legal sufficiency of those allegations:

Bucyrus also contends that GEC must, as an element of its section two "attempting to monopolize" claim, plead "facts showing that the defendant has sufficient market power ... to make its monopolization of that market a dangerous probability." We think this argument misconstrues the law. The complaint must allege a foundation for and be consistent with such a factual showing, but it asks too much at this early stage of litigation to require the complaint to make the factual showing. Facts showing a dangerous probability of monopolization would have to be alleged to stave off a summary judgment motion alleging contrary facts ... and will have to be proved at trial ..., but these are different matters. In short, the requirement that there be a showing of a dangerous probability of monopolization "is a matter of proof," *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 178, 86 S.Ct. 347, 351, 15 L.Ed.2d 247 (1965), not pleading.

In those terms, at the very least SJ's allegations "are consistent with" the notion General's alleged attempt to monopolize poses a dangerous probability of success. General's contrary arguments must fail.

### Motion To Strike

█ Count Seven relies on allegations in ¶¶ 39–41 that General instituted an Illinois state court action against SJ as part of its attempt to monopolize the manufacture of seals. In General's view, those allegations are immaterial in Rule 12(f) terms because the *Noerr-Pennington* doctrine [9] bars an antitrust claim based on litigation instituted by General against SJ. Because SJ's counsel have failed to respond to that argument, this Court is (inappropriately) forced to do their work for them.

*Noerr-Pennington* principles hold in essence that rights of association and petition shield from the antitrust laws any attempts to persuade legislatures to adopt particular laws (*Noerr*) and any attempts to persuade the executive branch to take certain lawful enforcement actions (*Pennington*). But ¶ 40 alleges General filed its state lawsuit principally to eliminate SJ as a competitive market force. In those circumstances General's state court litigation is what *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533 (though speaking of different conduct) terms "a mere sham to cover what is actually an attempt to interfere directly with the business relationships of a competitor[, so that] the application of the Sherman Act would be justified." Such a predatory misuse of litigation to injure a competitor falls outside the *Noerr-Pennington* shield against antitrust liability. See *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). General's motion to strike is denied.

### Conclusion

General's motion to dismiss is granted as to Count Two. Its motion is denied as to Count One (conditioned on SJ's amendment of that count on or before February 7, 1986) and Count Three, and its motion to strike ¶¶ 39–41 is also denied. General is ordered to answer the surviving portions of

---

**9.** *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers* *of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

the Complaint on or before February 17, 1986.