John L. **DUNHAM** and **Mostly Que, Inc.,** an Illinois corporation, Plaintiffs,

v.

**INDEPENDENCE BANK OF CHICAGO,** a national banking corporation, Defendant.

No. 85 C 8343.

United States District Court, N.D. Illinois, E.D.

Feb. 20, 1986.

Wilfred A. Rice, Jr., Chicago, Ill., for plaintiffs.

George A. Platz, Anne M. Gallagher, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Dunham ("Dunham") and Mostly Que, Inc. ("Mostly Que") have filed a five-count Amended Complaint (the "Complaint")[1] against Independence Bank of Chicago ("Bank")—a wholly-owned subsidiary of Indecorp, Inc. ("Indecorp")[2]—charging:

1. violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Count I);

2. violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, ¶¶ 261–272 (Count II);

3. common-law fraud and breach of fiduciary duty (Count III);

4. negligent supervision of employees (Count IV); and

5. breach of contract (Count V).

Bank has now moved under Fed.R.Civ.P. ("Rule") 9(b) and 12(b)(6) to dismiss the Complaint. For the reasons stated in this memorandum opinion and order, both the Complaint and this action are dismissed— Counts II through VI without prejudice.

### Facts[3]

On February 10, 1983 Dunham incorporated Mostly Que to establish a barbeque

---

1. All references to portions of the Complaint in this opinion will simply take the form "Count—" or "¶ —."

2. Bank is alleged to be "engaged in interstate commerce" (¶ 5). However, the Complaint is silent as to any Indecorp nexus with such commerce—a relevant consideration, as later text discussion shows.

3. For purposes of the motion to dismiss, this Court has accepted as true the Complaint's well-pleaded factual allegations, drawing all reasonable factual inferences in favor of Dunham and

and "soul food" restaurant in Chicago (¶¶ 6, 8). In May Dunham retained an accounting firm to prepare a Small Business Administration ("SBA") loan guaranty application for Mostly Que (¶ 9). In June Dunham delivered Mostly Que's SBA loan application to Bank loan officer Gilbert Bland ("Bland"), telling Bland of his plans for Mostly Que (¶ 10). Bland assured Dunham Bank would submit Mostly Que's loan application and Bank's lender application to SBA (*id.*). During discussions in June and July Bland assured Dunham that Bank was processing the SBA application (¶ 11).

On July 16, 1983—at Bland's urging—Dunham opened a Mostly Que checking account at Bank, with an initial deposit of $18,758.71 (¶ 12). At Bland's further requests, and in reliance on Bland's assurances as to Bank's processing of the SBA loan application, Dunham built the checking account balance up to more than $25,-000 (*id.*) Bank frequently used the mails to communicate with Dunham about the checking account (*id.*).

On July 30 Bank delivered a $70,000 loan commitment letter to Dunham (Complaint App. A), made subject by its terms to Mostly Que's obtaining a 90% SBA guaranty and Dunham's personal guaranty (which he was prepared to provide) (¶ 13). Bland continued to assure Dunham of Bank's processing of the SBA loan application (¶ 14). In reliance on Bank's loan commitment and Bland's statements, Mostly Que hired a design and planning firm to plan the Mostly Que restaurant and a satellite food preparation and storage facility (*id.*).

On August 15 and 26 Dunham mailed supplemental reports to Bank (requested by Bland) covering Mostly Que's developing projects (¶ 15). Bland continued to represent he was "working with the SBA" on the SBA loan application (*id.*). In reliance on those representations and with Bank's knowledge, Mostly Que leased space for its satellite facility (*id.*).

From June to October 1983 Bland and Bank's President and Chief Executive Officer Alvin Boutte ("Boutte") encouraged Mostly Que. *Wolfolk v. Rivera*, 729 F.2d 1114, Mostly Que to buy barbeque pits and other restaurant equipment Bank had repossessed from another borrower (¶ 16). In further reliance on Bank's representations as to the loan application, Mostly Que purchased from Bank (*id.*):

1. two barbeque pits for $7,000 (Complaint App. B); and

2. other restaurant equipment for some $8,000.

In late 1983 Dunham suggested to Bank that he temporarily use the satellite facility to open a test restaurant to train employees, break in equipment and test possible menus (¶ 17). Bland encouraged Dunham to do so, and the test restaurant opened in November 1983 (*id.*). Because of the satellite facility's remote location, Dunham never intended it to become Mostly Que's permanent place of business (*id.*). Dunham's operation of that facility turned out to be a financial disaster.

In January 1984 Dunham asked Bank to honor its July 1983 loan commitment to Mostly Que (¶ 18). Bank wrote Dunham by mail that he still owed Bank $7,000 for the restaurant equipment purchased in 1983 (*id.*). Bank told Dunham it would "go ahead with the loan" as soon as Dunham paid for the equipment (*id.*). On April 19, 1984 Dunham paid Bank the $7,000, and Bland assured Dunham Bank was "back on it" (that is, the asserted ongoing efforts to process the SBA application) (*id.*).

During the summer of 1984 Bland continued to assure Dunham he "was working with the SBA," but nothing happened (¶ 19). After a time Bland failed to return any of Dunham's repeated telephone calls (*id.*). On September 25 Dunham mailed a letter to Boutte "pleading for some action," but Boutte never responded (*id.*).

On October 4 Dunham met with Boutte (¶ 20), who:

1. told Dunham Bank's July 1983 letter (Complaint App. A) was not a loan commitment;

1116 (7th Cir.1984).

2. demanded Dunham's repayment of a personal home improvement loan; and

3. refused to repurchase the restaurant equipment.

On October 12 Bland told Dunham the SBA would probably turn down Mostly Que's application (¶ 20). That led Dunham to communicate directly with SBA, which on October 17 told Dunham it had never received any such application at all (¶ 21). Thus Bank's course of action had been a hoax from the beginning, and all its representations about processing the loan application had been known falsehoods.

### Bank's Contentions

Bank says the Complaint's RICO claim is flawed because Count I fails adequately to allege:

1. mail fraud as the predicate act underlying the RICO claim;

2. a "pattern" of "racketeering activity"; and

3. investment or use of income derived from Bank's alleged racketeering activity.

Although the second of those contentions proves dispositive (so that discussion of the others ultimately turns out to be dictum), the continuing evolution of civil RICO—and its high profile in current commercial litigation—merits treatment of all three issues in this opinion. Such treatment is also appropriate in light of the ultimate result of this opinion: dismissal of this action (albeit without prejudice as to the state-law claims) as well as the Complaint.

### RICO's "Racketeering Activity" Requirement: Herein of Mail Fraud

RICO § 1962(a) renders unlawful (among other things) the use of income derived by any person "from a pattern of racketeering activity" in the operation of an enterprise engaged in, or whose activities affect, interstate commerce. RICO § 1962(c) makes illegal the conduct—again "through a pattern of racketeering activity"—of the affairs of an enterprise engaged in, or whose activities affect, interstate commerce.

RICO § 1961(1) defines "racketeering activity" as any of a large number of specified illegal acts, including "any act which is indictable under ... [18 U.S.C.] section 1341 (relating to mail fraud)."

Any mail fraud violation—and hence any derivative RICO violation—requires two elements:

1. a scheme to defraud; and

2. the use of the mails to further that scheme.

See, e.g., United States v. Flomenhoft, 714 F.2d 708, 713 (7th Cir.1983), cert. denied, 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984). Bank asserts Count I does not adequately allege either of those elements.

### 1. Scheme To Defraud

■ Rule 9(b) states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally.

Tomera v. Galt, 511 F.2d 504, 508 (7th Cir.1975) (citations omitted), still the leading case on the subject in our Circuit, interpreted Rule 9(b) liberally:

Rule 9 must be read together with rules 8(a)(2), 8(e)(1) and 8(f), Fed.R.Civ.P. . . . Rule 8 requires that a plaintiff give through his pleadings notice to defendant of the nature of his claims. . . . It urges the plaintiff to make known his claims simply and concisely in short, plain statements. With these principles in mind, the purpose of rule 9 becomes clear. Rule 9 lists the actions in which slightly more is needed for notice. In a fraud action, a plaintiff need also state "with particularity" the circumstances constituting the fraud.

Dunham and Mostly Que have met that test here.

Soules v. General Motors Corp., 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) states the familiar

five elements essential to a cause of action for fraudulent misrepresentation: [4]

(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.

Bank Mem. 4 says the Complaint fails to describe such a claim. But each of those elements is clearly alleged:

1. Bank made false statements to Dunham about its processing of Mostly Que's SBA loan application (¶¶ 10, 11, 14, 15, 18 and 19).

2. Bank knew those statements were false (¶¶ 16 and 21).

3. Bank made the misrepresentations intending to induce Dunham and Mostly Que to forego other avenues of financial assistance, to deposit funds in Bank and to purchase equipment from Bank (¶ 21).

4. Bank's misrepresentations in fact caused Dunham and Mostly Que to take those and other actions (¶¶ 12, 14, 16, 17 and 21).

5. Bank's false statements damaged plaintiffs by causing them to expend substantial sums of money in preparing to open a business that could not succeed without the SBA loan (¶ 22).

In sum, the Complaint unquestionably alleges a "scheme to defraud." And it satisfies *Tomera*, 511 F.2d at 509, which calls only for allegations of:

the details, a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants. This is enough. More information can be gathered through discovery.

Dunham and Mostly Que have sufficiently identified the content of the alleged fraudulent statements, by whom and to whom they were made, the range of dates on which they occurred and Bank's alleged

purpose in making them. No pleading need set out the detailed evidence plaintiffs would use to support the claim at a later date. *Caliber Partners, Ltd. v. Affeld*, 583 F.Supp. 1308, 1311 (N.D.Ill.1984). Bank's attempt to invoke Rule 9(b) is unavailing.

*2. Use of the Mails*

Bank also attacks the other element of a mail fraud claim—the use of the mails "for the purpose of executing" the scheme to defraud. As *United States v. Maze*, 414 U.S. 395, 405, 94 S.Ct. 645, 651, 38 L.Ed.2d 603 (1974) (footnote omitted) said:

Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this; instead, it required that the use of the mails be "for the purpose of executing such scheme or artifice...."

*United States v. Cina*, 699 F.2d 853, 861 (7th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983) put the same concept a bit differently (quoting *United States v. Brown*, 583 F.2d 659, 664 (3d Cir.1978)):

The completion of the scheme must depend in some way upon the mailing charged.

Here the Complaint identifies several mailings or groups of mailings:

1. Bank frequently used the mail to communicate with Dunham and Mostly Que about the checking account Mostly Que opened in July 1983 (¶ 12).

2. At Bank's request, Dunham mailed two progress reports to Bank about Mostly Que's proposed plans (¶ 15).

3. Bank dunned Dunham by mail for the $7,000 he still owed for the purchase price of the restaurant equipment (¶ 18).

4. Dunham used the mail to ask Boutte for action on the SBA loan (¶ 19).

---

**4.** Though the offense required for a RICO violation is federal (not state) fraud, the ingredients of fraud identified in the Illinois cases wholly match the universal (and thus the federal) content of that offense.

Bank advances three asserted reasons why those mailings were not in execution of the alleged scheme to defraud:

1. Dunham—the victim of the fraud—made three of the mailings.
2. None of the items mailed contained the alleged misrepresentations.
3. None of the mailings bears more than an incidental connection to the scheme to defraud.

Bank's counsel must surely know the first two of those "reasons" are so wholly without merit as to deserve short shrift (at best).[5] Only the third requires any extended treatment.

■ As for the first of Bank's reasons, it is by now black-letter law that so long as a mailing is "integral to the offense," it matters not a whit that the offender has no direct involvement with the mailing (either as sender or as recipient). *United States v. Murphy*, 768 F.2d 1518, 1529 (7th Cir. 1985). That is not the sense in which 18 U.S.C. § 1341 requires a defendant to have "caused" the mailing (*id.* at 1530). A fortiori, then, there is a "well-established rule that mailings from the victims can be mailed in execution of the fraud" (*United States v. Toney*, 598 F.2d 1349, 1353 (5th Cir.1979)). As long as Dunham's mailings constituted a reasonably foreseeable response to Bank's actions, they suffice to support a mail fraud claim (*id.* at 1355). Here Dunham's mailings of his proposed business plans and his request for action surely represented a reasonably foreseeable response to Bank's continued false representations that it was processing the SBA loan sought by Dunham and Mostly Que for the business.

■ As for Bank's second reason, it is equally beyond dispute that nothing requires the items mailed to contain the false representations of the underlying scheme to defraud. *United States v. Gatewood*, 733 F.2d 1390, 1395 (10th Cir.), *cert. de-*

*nied,* —— U.S. ——, 105 S.Ct. 200, 83 L.Ed.2d 132 (1984) states the universal rule:

It is not necessary that the item mailed show on its face that the item was mailed in furtherance of the scheme.

Accord, *United States v. Yonan*, 622 F.Supp. 721, 733 (N.D.Ill.1985) (mailed bail bond refunds—triggered by fraudulent case dispositions—need not themselves be fraudulent).

■ Bank's third argument has a good deal more force, though not in the somewhat simplistic way Bank's counsel pose it. Bank Mem. 7 says none of the mailings "relates" to Bank's alleged scheme to defraud Dunham and Mostly Que. In essence Bank would have it the mailings must somehow have promoted the making of the alleged false statements to Dunham and Mostly Que. But the alleged scheme to defraud Dunham and Mostly Que encompassed more than the mere uttering of false statements. *Murphy*, 768 F.2d at 1530 describes the necessary relationship between the charged scheme and the mailings:

But the statute does not demand that the mail ... be essential to the offense. It is enough if use of the mail is an ordinary or expectable event in the course of the scheme and the mailings further the scheme.

Here Bank's claimed scheme involved luring Dunham and Mostly Que into establishing a business relationship with Bank by misrepresenting Bank's efforts to process Mostly Que's SBA loan application. Bank allegedly used its misrepresentations:

1. to induce Dunham to open Mostly Que's checking account at Bank and to deposit and maintain large sums of money in that account; and
2. to induce Dunham and Mostly Que to purchase used restaurant equipment from Bank on credit.

---

5. Of course a lawyer never knows what argument will strike a responsive chord in the judge to whom it is submitted. All the same, counsel must recognize the possibility that offering up such obviously spurious positions may be counterproductive, derogating (in the same way as the boy who cried "Wolf!") from the force of contentions that do have some substance. And of course the tendering of wholly empty arguments also poses risks under Rule 11.

Examination of the claimed mailings to see whether they were "an ordinary or expectable event in the course of the scheme" and "further[ed] the scheme" produces a mixed bag:

1. Mailings connected with the checking account plainly met the first of those standards, but without more fleshing-out of the allegation this Court cannot speculate as to how they served to "further the scheme."

2. Bank's requests for Dunham's supplemental reports on the Mostly Que business project furthered the appearance—integral to the scheme—that Bank was negotiating for the SBA loan. At a minimum those requests served the "lulling" purpose our Court of Appeals has again found mail-fraud-actionable in *United States v. Kuna*, 760 F.2d 813, 819–20 (7th Cir.1985); *cf. United States v. Bonansinga*, 773 F.2d 166, 169 (7th Cir.1985) ("lulling" concept recognized but held not applicable).

3. Bank's mailing of the request for payment for the equipment was specifically (and successfully) aimed at obtaining the profits of Bank's alleged scheme to induce the purchase of the equipment.

4. Dunham's request to Boutte for Bank action was certainly a reasonably foreseeable result of Bank's failure to follow through on the SBA loan application. To find that request served to "further the scheme," though, this Court would have to be provided something more.[6]

Thus some (though not all) of the mailings had the required connection to Bank's scheme to defraud Dunham and Mostly Que. That adequately establishes the predicate mail fraud acts underlying Count I's RICO claim.

---

6. Indeed ¶¶ 19–20 suggest Dunham's unanswered plea to Boutte was one of the events that led to uncovering the asserted scheme (contrast the "lulling" activity of Bank just discussed in

*RICO's Required "Pattern" of Racketeering Activity*

■ Bank next challenges Count I as not establishing a "pattern of racketeering activity." RICO § 1961(5) speaks briefly to the statute's "pattern" prerequisite:

"[P]attern of racketeering activity" requires at least two acts of racketeering activity. . . .

But *Sedima, S.P.R.L. v. Imrex Co.*, ––– U.S. –––, 105 S.Ct. 3275, 3285 n. 14, 3287, 87 L.Ed.2d 346 (1985) made clear (1) that statutory definition marks out only the minimum requirement of the "pattern" concept and (2) courts should seek "to develop a meaningful concept of 'pattern.'" This Court has since spoken to that issue on several occasions, first (and perhaps most extensively) in *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 831–33 (N.D.Ill.1985); see also this Court's several later opinions upholding the survival of civil RICO claims against "pattern" attacks: *United States v. Yonan*, 622 F.Supp. 721, 728 (N.D.Ill. 1985); *Papagiannis v. Pontikis*, 108 F.R.D. 177, 179 (N.D.Ill.1985); *S.J. Advanced Technology & Manufacturing Corp. v. Junkunc*, 627 F.Supp. 572, 576–77 (N.D.Ill.1986); and see Judge Getzendanner's opinion, embracing much the same approach, in *Graham v. Slaughter*, 624 F.Supp. 222, 224–25 (N.D.Ill.1985).

Dunham and Mostly Que fail the "pattern" test. As this Court has parsed the mailings alleged in the Complaint, Bank was guilty of "at least two acts of racketeering activity." But each of those predicate acts occurred in the execution of a single fraudulent scheme—in fact, in connection with just a single (though repeated) substantive misrepresentation. According to Dunham and Mostly Que, Bank made the same misrepresentation to them—the false statement it was processing the SBA loan—on numerous occasions. But the fact that Dunham channelled cash to Bank on

---

the text). In that limited way, who authors a particular mailing *may* make a difference to the viability of a mail fraud charge.

more than one occasion as a result of that repeated refrain does not convert Bank's one-dimensional scheme into a RICO "pattern." Bank's frequent repetition of the identical misrepresentation to implement a single plot to bilk Dunham and Mostly Que resembles the mailing of more than one letter to further a single kickback scheme (the situation in *Inryco* ).

Thus Count I has not satisfied the "pattern" requirement as articulated in *Inryco,* 615 F.Supp. at 831 (emphasis in original):

> True enough, "pattern" connotes similarity, hence the cases' proper emphasis on relatedness of the constituent acts. But "pattern" also connotes a multiplicity of events: Surely the continuity inherent in the term presumes repeated criminal *activity,* not merely repeated *acts* to carry out the *same* criminal activity.

And that conclusion is fortified by contrasting the present situation with those found to meet the "pattern" criterion in such cases as *Yonan, Papagiannis, S.J. Advanced Technology* and *Graham.*

### RICO §§ 1962(a) and (c) Requirements

Both the Complaint and (to a lesser extent) plaintiffs' supporting Memorandum demonstrate a lack of reading, and a consequent lack of understanding, of the quite straightforward requirements of RICO §§ 1962(a) and (c). To their discredit, Bank's counsel betray somewhat the same failing, attacking the Complaint under RICO § 1962(a) (where it is *not* vulnerable) and not even speaking to RICO § 1962(c) (under which the Complaint *is* defective).

At the outset, Bank is the only named defendant. It and it alone is charged as the "person" that assertedly violated the mail fraud statute. *Parnes v. Heinold Commodities, Inc.,* 548 F.Supp. 20, 23–24

(N.D.Ill.1982); *Fields v. National Republic Bank of Chicago,* 546 F.Supp. 123, 124–25 (N.D.Ill.1982). From that basic premise the two RICO subsections just referred to, each called into play by ¶¶ 24 and 27, may be examined.

### 1. RICO § 1962(a)

■ RICO § 1962(a) speaks of the "person"—the defrauder in a mail fraud scheme—using or investing the ill-gotten gains in an "enterprise ... engaged in ... interstate ... commerce." Both those things ("enterprise" and "in commerce") are adequately alleged as to Bank in ¶ 24, and ¶ 5 also says "Bank is engaged in interstate commerce."

What of the other statutory requirements? Both ¶¶ 12 and 16 say Bank derived income through the use of the funds obtained from the bank deposits and from the equipment sale (each of those sources of funds having been a specific fruit of the fraudulent scheme). And ¶ 21 alleges Bank used those funds "for its own benefit." Given the pro-plaintiff inferences called for on a Rule 12(b)(6) motion, coupled with the fact Bank by definition had the possession (and hence the use) of those funds, those allegations can be read as stating Bank used the income in its own operation. Under *Masi v. Ford City Bank and Trust Co.,* 779 F.2d 397, 401–02 (7th Cir.1985) that situation, in which Bank was both the "person" and the "enterprise," suffices for RICO § 1962(a) purposes.[7]

Bank's other line of attack—based upon respondeat superior notions—requires only the briefest comment. Without expressing any opinion on the ultimate question of the level of guilty knowledge required of a corporate RICO defendant,[8] this Court

---

**7.** Plaintiff's Mem. 5–6 correctly urges this result in an abbreviated discussion. It is true Complaint ¶ 24 makes a quite different and incorrect assertion of the operative legal principles:

> [Bank] was the principal and perpetrator and the direct or indirect beneficiary of the said [mail fraud] actions, and thereby liable under 18 U.S.C. § 1962(a).

However, the Complaint can survive notwithstanding such conceptual errors by plaintiffs'

counsel. One of the corollaries of *Hishon v. King & Spalding,* 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984) is that a plaintiff may succeed in stating a cause of action despite himself or herself.

**8.** Obviously the loan-related activities of a loan officer such as Bland are attributable to Bank in straight respondeat superior terms. As for whether that is enough to establish civil RICO

points out the pleading stage—the sufficiency of the Complaint in Rule 12(b)(6) terms—is not the time or place to pose that question, given the favorable inferences to which plaintiff is entitled on the current motion.

### 2. *RICO § 1962(c)*

 Bank has not mentioned the RICO § 1962(c) claim also sought to be asserted in the Complaint. It should have, for that claim is clearly inadequate in the present state of the pleadings.

Though the proposition was novel when voiced by this Court in *Parnes*, 548 F.Supp. at 23–24, it is by now old hat that RICO § 1962(c) requires a *separate* "person" and "enterprise." *Haroco v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 400–02 (7th Cir.1984) (adopting the *Parnes* analysis), *aff'd per curiam*, —— U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). With Bank charged as the culpable "person," only its parent Indecorp can be the "enterprise" if Bank is to be liable under RICO § 1962(c).[9]

But the "enterprise" must be one "engaged in, or the activities of which affect, interstate ... commerce." As with the failure to identify Indecorp qua "enterprise," the Complaint is wholly silent on that score. And quite unlike the judicial-notice nature of Indecorp's "enterprise" status (see n. 9), it would be quite improper for this Court on its own to *infer* that a bank holding company has the requisite interstate-commerce connection, where the Complaint says nothing at all on that sub-

ject. On the contrary, such holding companies are frequently passive vehicles for investment, rather than active commerce-affecting businesses. That, then, represents one deficiency in the Complaint's meeting of the RICO § 1962(c) standards.

There is more. Both ¶¶ 12 and 16 contain the entirely conclusory statement that "Bank 'derived income' from the scheme, 'which income benefitted the operations of Indecorp.'" And those allegations are mirrored in the similar conclusion of ¶ 21, and in ¶ 24's statement that:

> [Bank] conducted such activities on behalf of and to the benefit of, its parent corporation, Indecorp, Inc. and thereby liable under 18 U.S.C. § 1962(c).

But what RICO § 1962(c) requires is that the culpable "person" (here Bank) must "conduct or participate, directly or indirectly, in the conduct of such enterprise's [Indecorp's] affairs through a pattern of racketeering activity...." Nothing in the subsidiary Bank's upstream relationship to its parent Indecorp,[10] or in the generalized and unfocused allegations of the Complaint referred to in this paragraph, does the necessary pleading job in that respect. Nor does the principle of reasonable inferences cure the absence of the necessary allegations on that score.

\* \* \*

It must be concluded that even had the Complaint survived in "pattern" terms, as it has not, half of its RICO reliance would be unsupportable. Bank could remain liable under RICO § 1962(a) but not RICO § 1962(c).

responsibility against the legal fiction that is a corporation, the question of just who in the corporate hierarchy must know the tainted origin of the proceeds thereafter used in corporate operations may or may not be a separate issue. As the text suggests, that issue implicates proof rather than pleading considerations, and it is therefore not ripe for current decision.

**9.** True enough, the Complaint does not *allege* Indecorp's "enterprise" status, as ¶ 24 does with respect to Bank. However, the all-embracing definition of "enterprise" in RICO § 1961(4)

necessarily includes Indecorp, thus making the omission irrelevant.

**10.** That is, it might possibly be argued that there is a reasonable inference that a parent corporation "conducts or participates in the conduct" of the affairs of its subsidiary (though such an automatic assumption is almost equivalent to a universal piercing-the-corporate-veil rule). But there is certainly no basis for assuming the subsidiary's comparable degree of control over its parent.

*Conclusion*

Bank's motion to dismiss Complaint Count I is granted. Three factors counsel converting that dismissal into a final order:

1. When this action was initially filed, this Court issued a brief October 1, 1985 memorandum opinion and order dismissing the original complaint sua sponte because of specifically identified civil RICO deficiencies. Though the doctrine reflected in this Court's *Inryco* opinion did not represent one of those flaws, the October 1 opinion did include a caveat based on (and citing to) *Inryco*.

2. After the Complaint was filed in response to that October 1 opinion, this Court entered a November 8, 1985 order directing plaintiffs to address the "pattern" problem as it bore on their RICO claim. Their November 19, 1985 memorandum (which antedated the briefing on Bank's current motion) did not recognize or speak to the problem posed by *Sedima* and dealt with in *Inryco* and elsewhere.

3. Most importantly, the reasons a flawed complaint is normally dealt with by its dismissal, and not by dismissal of the action itself, is to permit plaintiffs to go back to the drawing board. But where the flaw is not curable (as is true here on "pattern" grounds if no other), it is the cause of action (and not merely the particular complaint) that must succumb. See *Car Carriers, Inc. v. Ford Motor Co.*, 561 F.Supp. 885, 889 & n. 12 (N.D. Ill.1983), *aff'd*, 745 F.2d 1101, 1111–12 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

Because the Complaint's other claims derive solely from state law, they are no longer pendent to any federal claim, so the remaining Counts must also be dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Accordingly, this entire action is dismissed—Count I with prejudice and the other counts without prejudice to their reassertion in a court of competent jurisdiction.